Frank S. Hedin (Pro Hac Vice Application Pending)
Arun G. Ravindran (Pro Hac Vice Application pending)
**HEDIN HALL LLP**
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinhall.com
aravindran@hedinhall.com

DAVID W. SCOFIELD – 4140
**PETERS | SCOFIELD**
*A Professional Corporation*
7430 Creek Road, Suite 303
Sandy, Utah 84093-6160
Telephone:  (801) 322-2002
Facsimile:   (801) 912-0320
E-Mail:      dws@psplawyers.com

Attorneys for Plaintiff and the Putative Class

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| JAMES CAMORAS, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> PUBLISHERS CLEARING HOUSE, LLC, <br><br> Defendant. | **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> Case No. _____ <br><br> Honorable _____ |

Plaintiff James Camoras, individually and on behalf of all others similarly situated, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## INTRODUCTION

1.     Defendant Publishers Clearing House, LLC ("PCH") rented, sold, and/or otherwise disclosed for compensation detailed information about Plaintiff's purchases of a tripod and a book to data aggregators, data appenders, data cooperatives, and list brokers, political organizations, and non-profit companies.  As a result, Plaintiff has received a barrage of unwanted junk mail.  By renting, selling, and/or otherwise disclosing for compensation Plaintiff's Private Purchase Information (defined below), without providing Plaintiff prior notice of these disclosures, PCH violated Utah's Notice of Intent to Sell Nonpublic Personal Information Act, Utah Code Ann. § 13-37 (the "NISNPIA").

2.     Documented evidence confirms these facts.  For example, PCH, through list broker NextMark, Inc. ("NextMark"), offers to provide renters access to the mailing list titled "Publishers Clearing House Buyers Masterfile Mailing List", which contains the Private Purchase Information of all 2,090,036 of Defendant's recent U.S. purchasers at a base price of "$100.00/M [per thousand]," (i.e., 10 cents apiece), as shown in the screenshot below:

2



*See* **Exhibit A** hereto.

3.     By renting, selling, or otherwise disclosing for compensation the Private Purchase Information of its customers to third parties, without providing its customers prior notice of such practices, PCH violated the NISNPIA.  Subsection 2 of the NISNPIA provides:

> A commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with [the provisions

requiring that prior notice of such disclosures be provided
to the consumer, as set forth in] Section 13-37-201.

Utah Code Ann. § 13-37-202(1).

4.      Accordingly, Plaintiff brings this Class Action Complaint against PCH
for its intentional, systematic, and unlawful disclosures of its customers' Private
Purchase Information in violation of the NISNPIA.

## NATURE OF THE CASE

5.      To supplement its revenues, PCH rents, sells, or otherwise discloses
for compensation its customers' information—including their full names, home
addresses, and fact that the listed individuals are purchasers of Defendant's products
(collectively "Private Purchase Information"), as well as myriad other categories of
individualized data and demographic information such as age, category(ies) of
products purchased, and dollar amount of purchase—to data aggregators, data
appenders, data cooperatives, aggressive advertisers, and other third parties without
the written consent of its customers.

6.      PCH's disclosure of Private Purchase Information and other
individualized information is not only unlawful, but also dangerous because it allows
for the targeting of particularly vulnerable members of society.

7.      While PCH profits handsomely from the unauthorized rentals, sales,
and/or other compensation-driven disclosures of its customers' Private Purchase
Information, it does so at the expense of its customers' statutory privacy rights

4

(afforded by the NISNPIA) because PCH does not provide any prior notice of such disclosures to its customers (much less obtain their consent) prior to disclosing their Private Purchase Information to third parties for compensation.

**PARTIES**

8.     Plaintiff James Camoras is a natural person and citizen and resident of, and domiciled in, St. George, Utah.  In or about December 2022 and February 2023, while a resident of and physically present in Utah, Plaintiff purchased a tripod and a book from Defendant.  Prior to and at the time Plaintiff made his purchases, PCH did not notify Plaintiff that it discloses the Private Purchase Information of its customers, and Plaintiff has never authorized PCH to do so.  Furthermore, Plaintiff was never provided any written notice that PCH rents, sells, or otherwise discloses for compensation its customers' Private Purchase Information, or any means of opting out.  Since making purchases from PCH, PCH disclosed, without providing Plaintiff the prior notice required by Utah Code Ann. § 13-37-201, Plaintiff's Private Purchase Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files.  Moreover, during that same period, PCH rented, sold, or otherwise disclosed for compensation lists containing Plaintiff's Private Purchase Information to third parties seeking to contact PCH's customers for their own independent business purposes, all without providing Plaintiff the prior notice required by Utah Code Ann. § 13-37-201 of such

5

rentals, sales, and/or other disclosures of his information for compensation.

9.     Defendant Publishers Clearing House, LLC is a New York corporation that maintains its headquarters and principal place of business in Jericho, New York and, through its registered agent, maintains an office in Utah at 1108 E South Union Ave., Midvale, Utah 84047.   PCH does business throughout Utah and the entire United States.  PCH is a seller of a wide variety of goods.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

11.     The Court has personal jurisdiction over PCH because Plaintiff's claims arose in substantial part from actions and omissions in Utah, including from Plaintiff's purchases of a tripod and a book while Plaintiff resided in Utah, PCH's direction of such products into Utah, and PCH's failure to provide to Plaintiff, in Utah, the notice required by Utah Code Ann. § 13-37-201 before disclosing his Private Purchase Information, including his residential address in Utah, to other persons, the effects of which were felt from within Utah by a citizen and resident of Utah.  Personal jurisdiction also exists over PCH in Utah because PCH is registered

to do business in Utah, maintains an office in Utah overseen by its registered agent, and conducts substantial business within Utah, such that PCH has significant, continuous, and pervasive contacts with Utah.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this judicial District, PCH does substantial business in this judicial District, PCH is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Utah's Notice of Intent to Sell Nonpublic Personal Information Act*

13.      Pursuant to the NISNPIA, "[a] commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with Section 13-37-201." Utah Code Ann. § 13-37-202.

14.      A "commercial entity" is a person that "has an office or other place of business located in [Utah]" and "in the ordinary course of business transacts a consumer transaction in [Utah]." *Id.* § 13-37-102(2)(a).

15.      "Consumer transaction" means, *inter alia*, "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition . . . of[] goods[,] services[,] or other tangible or intangible property, . . . that is initiated or completed

in [Utah]." *Id.* § 13-37-102(4)(a)(i).

16.     "Nonpublic personal information" means "information that . . . is not public information" and, "either alone or in conjunction with public information, identifies a person in distinction from other persons." *Id.* § 13-37-102(5)(a). "Nonpublic personal information" expressly includes, *inter alia*, "the purchasing patterns of a person" or "the personal preferences of a person." *Id.* § 13-37-102(5)(b)(iii)-(iv).

17.     A commercial entity "is considered to have obtained information as a result of a consumer transaction if . . . the person provides the information to the commercial entity . . . at any time during the consumer transaction . . . and at the request of the commercial entity," or if "the commercial entity otherwise obtains the information . . . and but for the consumer transactions, the commercial entity would not obtain the information." *Id.* § 13-37-201(1)(b).

18.     Section 13-37-201 of the NISNPIA requires a commercial entity to provide the consumer with a notice, in the form set forth in that section, if "the commercial entity enters into a consumer transaction with that person[,]" "as a result of the consumer transaction . . . , the commercial entity obtains nonpublic personal information concerning that person[,] and "the commercial entity intends to or wants the ability to disclose the nonpublic personal information . . . to a third party . . . for compensation," where such compensation "is the primary consideration

for the commercial entity disclosing the nonpublic personal information," is "directly related to the commercial entity disclosing the nonpublic personal information," and "is not compensation received by the commercial entity in consideration of a transaction [wherein a third party provides the commercial entity with: "(i) services, including business outsource services; (ii) personal or real property; or (iii) other thing of value"])." *Id.* § 13-37-201(1)(a); § 13-37-201(5) .

19.     The notice required by section 13-37-201 of the NISNPIA "shall read substantially as follows: 'We may choose to disclose nonpublic personal information about you, the consumer, to a third party for compensation." )." *Id.* § 13-37-201(3)(a).  The notice may be provided either "orally, if the consumer transaction itself is entirely conducted orally[,] or . . . in writing, if the notice is written in dark bold." *Id.* § 13-37-201(3)(b).  In either case, the notice "shall be sufficiently conspicuous so that a reasonable person would perceive the notice before providing the nonpublic personal information."  *Id.* § 13-37-201(3)(c). The notice "shall be given before the earlier of . . . the point at which the person is requested to provide the nonpublic personal information[] or . . . the commercial entity otherwise obtains the nonpublic personal information as a result of the consumer transaction[.]" *Id.* § 13-37-201(2).

20.     The NISNPIA entitles consumers who suffer violations of the statute to recover, *inter alia*, "$500 for each time the commercial entity fails to provide the

notice required by this section in relation to the nonpublic personal information of the person who brings the action." *Id.* § 13-37-203.

21.     Despite the fact that PCH has initiated or completed thousands of sales of its products to consumers in Utah, PCH disregarded its legal responsibility to these individuals by systematically violating the NISNPIA.

### The Private Information Market: Consumers' Private Information Has Real Value

22.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

23.     More than two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

---

[1]     **Exhibit B**, The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf   (last visited July 30, 2021).

[2]     *See* **Exhibit C**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited July 30, 2021).

24.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[3]

25.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[4]

26.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

---

[3]     **Exhibit D**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021) (emphasis added).

[4]     *See* **Exhibit E**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[5]     **Exhibit F**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at*

27.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[6]

28.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[7]

29.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy

---

https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N12061 6S.pdf (last visited July 30, 2021).

[6]     **Exhibit G**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

[7]     *See* **Exhibit H**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

concerns."[8]

30.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like  share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

31.     Information disclosures like those made by PCH are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely

---

[8]      *Id.*

[9]      *See* **Exhibit I**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

[10]     **Exhibit J**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

for the companionship that telephone callers provide."[11]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

32.     Thus, information disclosures like PCH's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

33.     PCH is not alone in jeopardizing its customers' privacy and well-being in exchange for increased revenue: disclosing customer information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties for compensation is a widespread practice in the consumer-products industries.

---

[11]      *Id.*

[12]      **Exhibit K**, *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at*   https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf  (last visited July 30, 2021).

[13]      *See id.*

34.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

35.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

36.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[14]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

37.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater

---

[14]     *See* **Exhibit L**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe,                                              http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

[15]     *Id.*

value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

38.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[16]

39.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[17]

40.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18]

---

[16]     *See* **Exhibit M**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

[17]     *See* **Exhibit N**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[18]     *See* **Exhibit O**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at*

### *PCH Unlawfully Rents and Otherwise Discloses for Compensation Its Customers' Private Purchase Information*

41.     PCH maintains a vast digital database comprised of its customers' Private Purchase Information.   PCH discloses for compensation its customers' Private Purchase Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each of its customers, including his or her age and dollar amount of purchase.  (*See, e.g.*, **Exhibit A**).

42.     PCH then rents and/or otherwise discloses for compensation its customer lists—which include all of its customers' Private Purchase Information, identifying which individuals purchased PCH's products, and can include the other sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

43.     PCH also discloses for compensation its customers' Private Purchase Information to data cooperatives, who in turn give PCH access to their own mailing list databases.

---

http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

44.     In short, PCH disclosed and continues to disclose its customers' Private Purchase Information to anybody willing to pay for it.

45.     As a result of PCH's data compiling and sharing practices, companies can purchase, rent, or otherwise obtain lists from PCH that identify PCH's customers by their most intimate details, including their personal preferences and purchasing habits.  PCH's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

46.     PCH failed to provide prior notice of these disclosures to its customers as required by Utah Code Ann. 13-37-201, much less obtain their consent prior to making such disclosures. As a result, PCH's customers in Utah (and elsewhere throughout the country) remain unaware that their Private Purchase Information and other sensitive information is being rented, sold, and otherwise disclosed for compensation on the open market.

47.     Consumers purchase PCH's products through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer makes a purchase, during the applicable statutory period PCH uniformly failed to provide the notice required by Utah Code Ann. 13-37-201 to – much less obtain any form of consent from – its Utah-based customers before they made purchases from PCH or before PCH disclosed their Private Purchase Information to

third parties for compensation.

48.     By and through these actions, PCH has disclosed to third parties its Utah-based customers' Private Purchase Information for compensation without providing the requisite prior notice of such disclosures, in direct violation of the NISNPIA.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff seeks to represent a class defined as all persons in Utah who had their Private Purchase Information obtained by PCH on or after January 1, 2004 as a result of a consumer transaction and who, at any point during the applicable statutory period, had such Private Purchase Information disclosed by PCH to one or more third party (the "Class"). Excluded from the Class is any entity in which PCH has a controlling interest, and officers or directors of PCH.

50.     Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the tens of thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of PCH.

51.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common

legal and factual questions include, but are not limited to: (a) whether PCH is a "commercial entity" within the meaning of the NISNPIA; (b) whether PCH provided the notice required by the NISNPIA to Plaintiff and Class members before they entered into consumer transactions with PCH; (c) whether PCH obtained Plaintiff's and Class members' Private Purchase Information as a result of consumer transactions, and whether such information constitutes "nonpublic personal information" within the meaning of the NISNPIA; (d) whether PCH disclosed Plaintiff's and Class members' Private Purchase Information to a third party; and (e) whether PCH's disclosures of Plaintiff's and the Class's Private Purchase Information to third parties violated the NISNPIA.

52.     The claim of the named Plaintiff is typical of the claims of the Class in that the named Plaintiff and the members of the Class all suffered invasions of their statutorily protected right to privacy (as afforded by the NISNPIA) as a result of PCH's uniform wrongful conduct, based upon PCH's disclosures of Plaintiff's and the Class's Private Purchase Information.

53.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

54.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish PCH's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of PCH's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSE OF ACTION**
**Violation of Utah's Notice of Intent to Sell**
**Nonpublic Personal Information Act**
**(Utah Code Ann. § 13-37)**

55.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

56.     Plaintiff brings this claim individually and on behalf of members of the Class against PCH.

57.     PCH maintains an office in Utah, and in the ordinary course of its business enters into transactions with consumers in Utah.  Accordingly, PCH is a

"commercial entity" within the meaning of the NISNPIA. *See* Utah Code Ann. § 13-37-102(2)(a).

58.     PCH's sales of tangible and/or intangible property to Plaintiff, including a tripod and a book, were initiated or completed in Utah, where Plaintiff resided at the time of the transactions. Accordingly, PCH entered into one or more "consumer transaction" with Plaintiff within the meaning of the NISNPIA. *See id.* § 13-37-102(4)(a)(i).

59.     As a result of such consumer transactions, PCH obtained information pertaining to Plaintiff that Plaintiff provided at PCH's request, and which PCH would not otherwise have obtained but for entering into such consumer transactions with Plaintiff. *See id.* § 13-37-201(1)(b). This information, referred to herein as Plaintiff's Private Purchase Information, included Plaintiff's "purchasing habits" and "personal preferences" within the meaning of the NISNPIA.

60.     At various times during the applicable statutory period, PCH disclosed Plaintiff's Private Purchase Information, which identified him as a purchaser of PCH's products, in at least three ways.

61.     First, PCH disclosed customer lists containing Plaintiff's Private Purchase Information to data aggregators and data appenders, who then supplemented the lists with additional sensitive information from their own databases, before sending the lists back to PCH.

62.    Second, PCH disclosed mailing lists containing Plaintiff's Private Purchase Information to data cooperatives, who in turn gave PCH access to their own consumer list databases.

63.    Third, PCH rented, sold, and/or otherwise disclosed its customer lists containing Plaintiff's Private Purchase Information—including lists enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

64.    Because many of PCH's customer lists included the additional information from the data aggregators and appenders, the lists were more valuable and PCH was able to increase its profits gained from the list rentals and/or exchanges.

65.    PCH made each disclosure of Plaintiff's Private Purchase Information, to each of the entities described in the preceding paragraphs, for compensation – namely, money. Indeed, PCH's disclosures of Plaintiff's Private Purchase Information were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase PCH's revenue.

66.    The information PCH disclosed indicates Plaintiff's name and address and the fact that he purchased PCH's products (as well as the categories and dollar

amounts of the products purchased), which was information not otherwise in the public domain. *See id.* § 13-37-102(5). Because the records or information disclosed by PCH reveal Plaintiff's "purchasing patterns" and "personal preferences," and "identif[y] [Plaintiff] in distinction from other persons," the records or information PCH disclosed to third parties constitute "nonpublic personal information" within the meaning of the NISNPIA. *See id.* § 13-37-102(5).

67.    Neither Plaintiff nor any member of the Class consented to PCH disclosing their Private Purchase Information to anyone.

68.    Worse yet, at no time before entering into consumer transactions with PCH or providing PCH with their Private Purchase Information did Plaintiff or any members of the Class receive the notice required by Utah Code Ann. § 13-37-201. Specifically, prior to entering into consumer transactions with Plaintiff and Class members and obtaining Plaintiff's and Class members' Private Purchase Information,  PCH failed to provide Plaintiff or any members of the Class with a clear and conspicuous notice in dark bold writing (or orally), such that a reasonable person would perceive the notice, stating that "[w]e may choose to disclose nonpublic personal information about you, the consumer, to a third party for compensation." *Id.* § 13-37-201(3)(a).

69.    PCH's disclosures of Plaintiff's and the Class's Private Purchase Information were not made to third parties in "relat[ion] to the third part[ies]

providing to [PCH] . . . services, including business outsource services[,] personal or real property[,] or other thing[s] of value," and the "compensation received by [PCH] as part of the transaction[s] [with third parties] [was not] received by [PCH] for or in consideration of such "third part[ies] providing to [PCH] [such] services, . . . personal or real property[,] or other thing[s] of value." *Id.* § 13-37-201(5).

70.     PCH is not "subject to a federal law or regulation that governs the disclosure of nonpublic information to a third party," nor is PCH "a covered entity as defined in 45 C.F.R. Parts 160 and 164." *See* Utah Code Ann. § 13-37-201(4).

71.     By disclosing Plaintiff's and the Class's Private Purchase Information to third parties for compensation, without providing prior notice to Plaintiff or Class members as required by Utah Code Ann. § 13-37-201, PCH violated Plaintiff's and the Class's statutorily protected right to privacy in their nonpublic personal information pertaining to their consumer transactions, as afforded by the NISNPIA. *See id.* § 13-37-202(1) ("A commercial entity may not disclose nonpublic personal information that the commercial entity obtained on or after January 1, 2004, as a result of a consumer transaction if the commercial entity fails to comply with Section 13-37-201.").

72.     On behalf of himself and the Class, Plaintiff seeks: (1) $500.00 to Plaintiff and each Class member, for each time Defendant failed to provide them the notice required by the NISNPIA in relation to their Private Purchase Information,

pursuant to Utah Code Ann. § 13-37-203(2)(a); and (2) costs pursuant to Utah Code Ann. § 13-37-203(2)(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as a representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.   For an order declaring that Defendant's conduct as described herein violated Utah's Notice of Intent to Sell Non-Public Information Act;

C.   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.   For an award of $500.00 to Plaintiff and each Class member, for each time Defendant failed to provide them the notice required by the NISNPIA in relation to their Private Purchase Information, as provided by the NISNPIA, Utah Code Ann. § 13-37-203(2)(a);

E.   For prejudgment interest on all amounts awarded; and

F.   For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit pursuant to Rule 23 and Utah Code Ann. § 13-37-203(2)(b).

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: December 15, 2023

Respectfully submitted,

PETERS | SCOFIELD
*A Professional Corporation*

/s/ David W. Scofield
DAVID W. SCOFIELD

     -and-

**HEDIN HALL LLP**
Frank S. Hedin (Pro Hac Vice App.
Pending)
Arun G. Ravindran (Pro Hac Vice App.
pending)

Attorneys for Plaintiff and the Putative Class